COLORADO COURT OF APPEALS 2016COA142

Court of Appeals No. 15CA0072
City and County of Denver District Court No. 13CV32833
Honorable Kenneth M. Laff, Judge

Naema Alhilo,

Plaintiff-Appellee,

v.

Daniel Kliem,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE WEBB
Ashby and Nieto*, JJ., concur

Announced October 6, 2016

Zaner Harden Law LLP, Kurt Zaner, Marc Harden, Elliot Singer, Denver, Colorado; Levin Rosenberg PC, Michael J. Rosenberg, Nelson A. Waneka, Denver, Colorado, for Plaintiff-Appellee

Campbell, Latiolais & Averbach, LLC, Colin C. Campbell, Kirstin M. Dvorchak, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1    Abdul Alhilo died in a collision between his motorcycle and a car driven by defendant, Daniel Kliem.  The deceased's mother, plaintiff Naema Alhilo, brought a wrongful death action against Kliem.  The jury allocated fifty-five percent of the fault to Kliem and forty-five percent to the deceased.  It awarded $750,000 in noneconomic damages and $1,500,000 in exemplary damages.  Kliem appeals the judgment entered on the verdict.  We affirm.

## I.  Background and Procedural History

¶ 2    The accident occurred on Federal Boulevard in Denver.  Kliem drove out of a car wash across the southbound lanes, intending to turn left and drive north.  The deceased, going south, sought to avoid a collision by moving to the inside lane, but still hit the side of Kliem's car.  He died at the scene.

¶ 3    When the accident occurred, the deceased was traveling at an estimated speed of between seventy-five and eighty-six miles per hour.  The speed limit was forty miles per hour.  His driving privileges had been suspended several years earlier based on his status as a habitual traffic offender (HTO).

¶ 4    After the collision, Kliem drove off.  He stopped his car a few blocks away and fled on foot, despite having been injured.  From

the car, the police recovered several beer cans — three of them opened — a bottle of vodka, and a pipe containing marijuana. The crash occurred on June 26th and Kliem turned himself in on June 28th. Several years earlier, he had been convicted of two driving while impaired (DWI) offenses.

¶ 5 During pretrial proceedings, the parties raised, and the trial court ruled on, all of the evidentiary issues argued in this appeal.

¶ 6 After the jury returned its verdict, plaintiff calculated Kliem's share of the noneconomic damages at $412,500 and sought judgment in that amount, correctly pointing out that it was less than the cap in section 13-21-203, C.R.S. 2016. Kliem responded that the court should apply the cap first, then apportion liability, which would result in a judgment of $239,838.50. The trial court agreed with plaintiff. The court denied Kliem's post-trial motions for a judgment notwithstanding the verdict on exemplary damages, alleging insufficient evidence, and for a new trial on liability, alleging evidentiary errors.

## II. Evidentiary Issues

¶ 7 Kliem contends the trial court made three evidentiary errors: excluding evidence of the deceased's driving record and his status

2

as an HTO; admitting evidence of Kliem's two prior DWI offenses; and admitting evidence that Kliem fled the accident scene. We address each one in turn but discern no ground for reversal.

## A. Standard of Review and Law

¶ 8 Evidentiary rulings are reviewed for an abuse of discretion. *Murray v. Just In Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 16. "[A] trial court necessarily abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *People v. Segovia*, 196 P.3d 1126, 1129 (Colo. 2008).

¶ 9 To begin, under CRE 401, evidence is logically relevant if it has "any tendency to make the existence of [a material fact] more probable or less probable than it would be without the evidence." In general, then, "[a]ll relevant evidence is admissible," unless the United States Constitution, the Colorado Constitution, a state statute, the evidence rules, or other rule prescribed by the supreme court prohibits its admission. CRE 402; *Murray*, ¶ 19. Even so, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations

of undue delay, waste of time, or needless presentation of cumulative evidence." CRE 403. In weighing those dangers and considerations, the proffered evidence "should be given its maximal probative weight and its minimal prejudicial effect." *Murray*, ¶ 19 (quoting *People v. Dist. Court*, 869 P.2d 1281, 1285 (Colo. 1994)).

## B. The Deceased's Driving Record and His HTO Status

¶ 10 Plaintiff moved in limine to preclude evidence of the deceased's driving record and his status as an HTO, arguing that this evidence — while uncontroverted — was not relevant. The trial court agreed and granted the motion. Now Kliem argues, as he did below, that the exception in section 42-4-1713, C.R.S. 2016, required the trial court to admit this evidence. We read the statute differently and conclude that the trial court acted within the scope of its broad discretion.

### 1. Statutory Standard of Review

¶ 11 Whether section 42-4-1713 requires the admission of a driver's HTO status and associated driving record in any civil trial is a question of statutory interpretation subject to de novo review. *Granite State Ins. Co. v. Ken Caryl Ranch Master Ass'n*, 183 P.3d 563, 567 (Colo. 2008).

¶ 12    When construing a statute, a court strives to "ascertain and effectuate the legislative intent, which is to be discerned . . . from the plain and ordinary meaning" of the text. *People v. Frazier*, 77 P.3d 838, 839 (Colo. App. 2003), *aff'd*, 90 P.3d 807 (Colo. 2004).  If the language is plain, the court must apply the text as written and not force or strain its interpretation. *Williams v. Dep't of Pub. Safety*, 2015 COA 180, ¶ 22.  "Only where the statute's language is ambiguous may we turn to other principles of statutory construction and consider the consequences of a certain construction, the end to be achieved by the statute, and legislative history." *People v. Vigil*, 2013 COA 102, ¶ 14 (citing *Bostelman v. People*, 162 P.3d 686, 690 (Colo. 2007)).[1]

---

[1] At oral argument, plaintiff advanced an interpretation of the statute similar to the one that we adopt, noting that the legislative history supported it.  Kliem claimed surprise because this interpretation had not been presented in plaintiff's answer brief and asked for leave to submit a supplemental brief.  We afforded the parties an opportunity to submit supplemental briefs.  As presented in those briefs, the legislative history is at best equivocal.  Therefore, we decline to consider cases such as *Lot Thirty-Four Venture, L.L.C. v. Town of Telluride*, 976 P.2d 303, 306 (Colo. App. 1998) ("If the statutory language is clear and unambiguous, the statute should be applied as written. . . .  Nevertheless, we may also consider other indicia of legislative intent, such as the object to be attained, the legislative history, and the consequences of the particular construction."), *aff'd*, 3 P.3d 30 (Colo. 2000).

## 2. Law

¶ 13    Section 42-4-1713 provides:

> Except as provided in sections 42-2-201 to
> 42-2-208, *no record of the conviction* of any
> person for any violation of this article [Article 4
> — the "Regulation of Vehicles and Traffic"]
> shall be admissible as evidence in any court in
> any civil action.

(Emphasis added.) *See Bullock v. Wayne*, 623 F. Supp. 2d 1247,
1254 (D. Colo. 2009) (Section 42-4-1713 "prohibits any mention of
convictions for violating the vehicle and traffic statutes in Article
4.").

¶ 14    More than fifty years ago, our supreme court said about a
prior version of section 42-4-1713: "the intent and purpose of such
a statute is too obvious to require discussion." *Ripple v. Brack*, 132
Colo. 125, 129, 286 P.2d 625, 627 (1955). Since then, no Colorado
court has examined this statute in depth.

¶ 15    Still, in *Bullock*, 623 F. Supp. 2d at 1256, the United States
District Court expounded on that obviousness. It explained that
because traffic convictions "tend to be minor in nature, informally
adjudicated, and often uncontested," by enacting section
42-4-1713, "[t]he Colorado legislature presumably did not want

these relatively small infractions to have grave consequences in civil actions where significantly more could be at stake." The court further explained that by prohibiting evidence of these convictions in civil actions, section 42-4-1713 "ameliorates docket congestion in traffic courts." *Bullock*, 623 F. Supp. 2d at 1256. This is so because "were traffic convictions to carry with them the threat of res judicata, the incentive to fight a traffic ticket would grow dramatically and, along with it, the caseload of traffic courts." *Id.*; *see Warren v. Marsh*, 11 N.W.2d 528, 531 (Minn. 1943) (Because "often citizens will plead guilty to minor offenses under the traffic act rather than suffer loss of valuable time and the expense of a trial . . . the legislature apparently concluded that a plea of guilty should not prejudice one in any way in any civil proceeding, even one involving the same facts out of which the violation of the traffic act arose.") (cited with approval in *Ripple*, 132 Colo. at 129, 286 P.2d at 627).

### 3. Analysis

¶ 16    Kliem concedes that section 42-4-1713 broadly prohibits evidence of Article 4 convictions in civil actions. Even so, he argues that the exception ("as provided in sections 42-2-201 to 42-2-208")

allows a party in *any* civil action "to present evidence that the adverse party has been deemed a danger to other motorists by virtue of the party's prior conviction as an habitual traffic offender." Here, because the proffered evidence consisted of both the deceased's status as an HTO and his associated driving convictions, separate analysis is required. But this case does not support admitting either type of evidence.

¶ 17     First, as to the deceased's convictions that led to his HTO status, the text unambiguously limits the exception: "as provided in sections 42-2-201 to 42-2-208." *Id.* The cross-referenced sections make up the HTO statute, which "defin[es] who is an habitual offender, authority for revocation, appeals, and other related matters." *Lawrence v. Taylor*, 8 P.3d 607, 610 (Colo. App. 2000).[2]

¶ 18     The administrative appeal described in section 42-2-203 for challenging revocation of a driver's license based on a determination of HTO status by the Department of Revenue, Motor Vehicles Division (DMV), is a civil proceeding. *State v. Laughlin*, 634 P.2d

---

[2] To the extent Kliem argues *Lawrence v. Taylor*, 8 P.3d 607, 610 (Colo. App. 2000), supports his interpretation, the court merely held, without discussion, that the decedent was not an HTO and his traffic convictions were "not admissible in this negligence action."

8

49, 51 (Colo. 1981). But without the exception in section 42-4-1713, evidence of Article 4 convictions would be prohibited. And without this evidence, a hearing officer could not decide "[t]he only issue to be determined at the license revocation hearing . . . whether the licensee has sustained the requisite number of convictions for specified traffic offenses within the prescribed period of time." *Id.*; *see also People v. McKnight*, 200 Colo. 486, 490, 617 P.2d 1178, 1181 (1980) (An HTO is defined "as one having a designated number of convictions for specified traffic offenses within a prescribed period of time.").

¶ 19    Thus, providing an exception under these sections — to allow evidence of Article 4 convictions *in an HTO proceeding* — is necessary. By any fair reading, the exception does not apply to any other civil action. Nor should it be interpreted more broadly. *See Brodak v. Visconti*, 165 P.3d 896, 898 (Colo. App. 2007) (When a "statute establishes a general rule, subject to [an] exception[], we must construe the exception[] narrowly to preserve the primary operation of the general rule.").

¶ 20    Second, the DMV determination that a driver is an HTO does not itself constitute a separate conviction. Rather, under the HTO

9

statute, the DMV has the authority to "immediately revoke the license of any person whose record brings such person within the definition of an habitual offender . . . ." § 42-2-203, C.R.S. 2016. In doing so, the DMV must "immediately notify the licensee," who, in turn, may request a hearing. § 42-2-125(3), (4), C.R.S. 2016.

¶ 21    But at that hearing, "[t]he hearing officer's determination is made by reference to the licensee's driving record, as reflected in the department's records." *Laughlin*, 634 P.2d at 51. And while "it is the licensee's responsibility to challenge alleged mistakes in the records of the department as to his driving history," the licensee "may not relitigate the issue of guilt as to the offenses shown on his record." *Id.*

¶ 22    Given all this, allowing evidence of the Article 4 convictions in any other civil action — merely because those convictions formed the basis of a person's HTO status — would defeat the purpose of section 42-4-1713, as explained in *Bullock*, 623 F. Supp. 2d at 1254. Specifically, such an interpretation would allow evidence of traffic convictions that may have been uncontested and thus invite

challenges to many traffic convictions that could later have serious consequences in civil actions.[3]

¶ 23    Turning to the admissibility of a driver's status as an HTO, that status is an administrative determination, not a separate or additional conviction.  Kliem cites no authority, nor are we aware of any in Colorado, treating such an administrative determination as a conviction.  *See McKnight*, 200 Colo. at 493, 617 P.2d at 1183 ("The administrative proceeding to revoke a driver's license because of habitual traffic offender status is a civil one."); *cf. People v. Kiniston*, 262 P.3d 942, 944 (Colo. App. 2011) (discussing various uses of "conviction").  Thus, the broad prohibition in section 42-4-1713 does not limit evidence of HTO status.  Instead, the admissibility of HTO status evidence remains subject to the rules of evidence, primarily CRE 401 and CRE 403.  And here, both rules weigh against admission.

---

[3] *See generally* Jay M. Zitter, Annotation, *Admissibility of Traffic Conviction in Later State Civil Trial*, 73 A.L.R.4th 691 § 2[a] (originally published in 1989) (Courts that generally preclude evidence of traffic convictions "have reasoned that since tickets and other traffic violations involve relatively small sums of money, drivers often pay the fines or plead guilty rather than waste time in court attempting to present a defense, and thus the reliability of the conviction is certainly suspect.").

¶ 24   As to CRE 401, the trial court found that evidence of the deceased's status as an HTO was not relevant. This finding is supported by the fact that evidence of the deceased's fault — traveling at nearly double the posted speed limit — was undisputed. Thus, even accepting Kliem's position that the HTO statute reflects a legislative determination of likely future irresponsible driving behavior, whatever inference of irresponsibility the jury might draw from evidence of the deceased's HTO status would have added very little. And the verdict shows that the jury gave considerable weight to the undisputed evidence of the deceased's proportionate fault.

¶ 25   The trial court did not address CRE 403. However, even assuming that status evidence had some minimal probative value, admission of evidence of HTO status — and its attendant license revocation — might have led the jury to conclude that had the deceased abided by the restriction, he would not have been operating his motorcycle. And as a result, the accident would never have occurred. But this inference is legally impermissible. *See Weaver v. Blake,* 454 F.3d 1087, 1094 (10th Cir. 2006) ("Colorado's appellate courts appear to follow the majority rule that whether or not a person has a valid driver's license is irrelevant to the question

12

whether that person was driving negligently at the time of the accident.").  Thus, any probative value was outweighed by the risk of unfair prejudice.

¶ 26     In sum, we conclude the trial court did not abuse its discretion by precluding evidence of the deceased's status as an HTO and his associated driving record.

### C.  Admitting Evidence of Kliem's Two Prior DWI Offenses

¶ 27     Plaintiff moved to add a request for exemplary damages based in part on Kliem's "prior alcohol convictions and . . . his reckless decision to consume alcohol and drugs the night of the crash and then get behind the wheel of a car."  The trial court granted the motion.  Kliem then moved in limine to preclude any evidence of those offenses.

¶ 28     The court denied Kliem's motion.  It held that Kliem's prior alcohol offenses were "clearly relevant to the determination of exemplary damages."  Citing out-of-state authority, the court explained:

> Certainly there's a knowledge that someone gains from having lived through a DUI that ought to influence their decision to drink and drive in the future.  Obviously, I'm not reaching the conclusion that [Kliem] had the

alcohol that day or was impaired at the time of the accident. It's going to be for the jury based on the evidence, but if they believe he was, then those priors are clearly relevant to exemplary damages.

¶ 29 Kliem tendered a limiting instruction on the prior offenses to which plaintiff objected, arguing "I don't believe that [Kliem's] prior driving offenses are only for the issue of [exemplary] damages." The court disagreed and told plaintiff's counsel it would not allow him to "try[] to prove [Kliem was] drunk by the fact that he has prior [offenses]." Then, when the prior offenses were mentioned during opening statement, the court instructed the jury:

Ladies and gentlemen, in certain circumstances evidence may be admitted for a limited purpose only. And the evidence that [counsel] indicated you would hear during the trial is an example of such evidence. It's evidence of . . . Kliem's prior driving offenses. It is offered solely for the limited purpose of your evaluation of [plaintiff's] punitive damages claim against . . . Kliem. The evidence is not to be considered by you in deciding the facts of what occurred on June 26th, 2011, including the . . . second issue of whether or not . . . Kliem ingested alcohol or was impaired by alcohol at the time of the June 26th, 2011, collision or whether or not he drove negligently at the time of the collision.

14

During direct examination of Kliem — when he was asked about the prior offenses — the court again gave this instruction.

¶ 30     Kliem argues, as he did before the trial court, that evidence of his prior alcohol offenses was not relevant, even as to exemplary damages, and any "probative value is far outweighed by the potential to inflame or mislead the jury."[4]

### 1. Law

¶ 31     Under CRE 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith."  Thus, evidence of prior similar incidents "cannot alone establish a prima facie case of negligence."  *Jacobs v. Commonwealth Highland Theatres, Inc.*, 738 P.2d 6, 9 (Colo. App. 1986) (noting that evidence of prior accidents may be admissible "when relevant to a material issue, and when its probative value outweighs any prejudice resulting from its admission").

---

[4] Kliem did not argue below, nor has he argued in this court, that the DWI evidence should have been excluded under section 42-4-1713.  Therefore, we do not express any opinion on this question.

15

¶ 32    Still, evidence of prior offenses may be admissible to support an award of exemplary damages. *Cf. Bennett v. Greeley Gas Co.*, 969 P.2d 754, 761 (Colo. App. 1998) (recognizing a difference between admissibility under CRE 404(b) and admissibility for exemplary damages). These damages arise under section 13-21-102(1)(a), C.R.S. 2016, which provides:

> In all civil actions in which damages are assessed by a jury for a wrong done to the person . . . and the injury complained of is attended by circumstances of fraud, malice, or *willful and wanton conduct,* the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages.

(Emphasis added.) Under this section, "willful and wanton conduct" means "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." § 13-21-102(1)(b); *see Jacobs*, 738 P.2d at 10 (evidence of prior accidents admissible to show the defendant's "awareness of the hazard" for purposes of "wanton and reckless disregard").

## 2. Analysis

¶ 33    Kliem argues that because the trial court found evidence of his prior alcohol offenses was irrelevant as to negligence, "then such evidence must be equally inadmissible for purposes of exemplary damages." He relies on *Bennett*, 969 P.2d at 761, where the division held that "acts of the wrongdoer occurring after the event creating liability ordinarily are not material to the jury's award of exemplary damages."

¶ 34    But unlike in *Bennett*, Kliem's alcohol offenses occurred *before* the accident at issue. Kliem cites no Colorado authority, nor have we found any, addressing the admissibility of such evidence for purposes of exemplary damages. Other jurisdictions to have done so, however, generally hold that prior alcohol offenses are relevant as to whether a defendant acted with willful and wanton conduct — the standard for exemplary damages. *See generally* Danny R. Veilleux, Annotation, *Intoxication of Automobile Driver as Basis for Awarding Punitive Damages*, 33 A.L.R.5th 303 (originally published in 1995).

¶ 35    In *Davidson v. Bailey*, 826 N.E.2d 80, 86 (Ind. Ct. App. 2005), for example, the court explained that "[a]n award of punitive

damages . . . is predicated on the intentional conduct of a defendant and asks the fact-finder to focus on that defendant's state of mind." As such, while a defendant's "subsequent DUI convictions would have no bearing on his state of mind the night of the accident, and were, thus, properly excluded, the same cannot be said of his four previous DUI convictions." *Id.* Similarly, the court in *Thompson v. Moore*, 329 S.E.2d 914, 916 (Ga. Ct. App. 1985), *aff'd in part, rev'd in part*, 336 S.E.2d 749 (Ga. 1985), *superseded by statute as stated in Webster v. Boyett*, 496 S.E.2d 459, 462 (Ga. 1998), explained:

> We can think of no circumstance more willful and wanton, more indicative of a conscious indifference to consequences, than repeated occurrences of driving while intoxicated. The fact that no injuries had previously occurred is largely irrelevant; the question for the jury would be whether in this particular case the appellee, having plead[ed] guilty to two instances of driving while intoxicated, acted in conscious disregard of consequences by again driving while intoxicated.

*See also Webster*, 496 S.E.2d at 462 ("We agree . . . that . . . a defendant's prior . . . acts of driving under the influence are relevant to whether the defendant acted with conscious indifference to the consequences in again driving under the influence.");

*Angeron v. Martin*, 649 So. 2d 40, 44 (La. Ct. App. 1994) (For

18

exemplary damages, "evidence of [the defendant's] knowledge of past acts [DWI offenses], and his disregard of the danger in the face of that knowledge is admissible.").

¶ 36 Consistent with the rationales in these cases, the trial court's finding that Kliem's prior alcohol offenses were relevant for exemplary damages was supported by Kliem's testimony during trial. He admitted that through attending alcohol education classes and victim impact panels — as required by the sentences for his prior offenses — he had learned about the dangers and consequences of alcohol impairing the ability to drive safely. *See Flockhart v. Wyant*, 467 N.W.2d 473, 478 (S.D. 1991) (Conduct was willful and wanton where the defendant "had been through drunk-driving classes, and in-patient alcoholic treatment programs [and] [s]he must have known, with substantial certainty, the danger which her conduct engendered."); *Huffman v. Love*, 427 S.E.2d 357, 360 (Va. 1993) (Conduct was willful and wanton where defendant "drove his vehicle in this highly intoxicated state, notwithstanding the fact he had received court-ordered education, on the dangers of drinking and driving, as a result of each of his prior drunk driving convictions.").

¶ 37 Still, Kliem argues that even if his prior alcohol offenses were relevant to exemplary damages, the court should not have allowed the jury to hear about them when determining negligence.

¶ 38 True, some courts have allowed evidence of prior alcohol offenses only in a separate proceeding on exemplary damages. *See, e.g.*, *Webster*, 496 S.E.2d at 462 (recognizing that "although relevant, the evidence [of prior alcohol offenses] is highly prejudicial to the issue of the defendant's liability in the underlying negligence case"). But Kliem did not ask for a bifurcated trial. Nor does he cite any Colorado authority supporting the notion that the trial court should have bifurcated the issues sua sponte.

¶ 39 Instead, the trial court acknowledged the potential for prejudice and gave an appropriate limiting instruction. And "absent evidence to the contrary, we presume that a jury follows a trial court's instructions." *Qwest Servs. Corp. v. Blood*, 252 P.3d 1071, 1088 (Colo. 2011). Kliem does not point to any such evidence.

¶ 40 For these reasons, we discern no abuse of the trial court's discretion in allowing evidence of Kliem's prior alcohol offenses for purposes of exemplary damages.

## D. Admitting Evidence that Kliem Fled the Accident Scene

¶ 41     Kliem moved in limine to preclude evidence that he had fled the accident scene.  He argued that this evidence was "irrelevant to the determination of which driver caused the accident."  The trial court denied the motion, finding that the evidence was "relevant to the state of mind and nature of driving . . . at the time of the accident."

### 1.  Law

¶ 42     "Negligence may be established by facts and circumstances surrounding an accident rather than by direct evidence."  *Lindauer v. LDB Drainlaying, Inc.*, 38 Colo. App. 266, 269, 555 P.2d 197, 199 (1976); *see Holmes v. Gamble*, 624 P.2d 905, 906 (Colo. App. 1980) ("The facts constituting negligent conduct, however, like any other facts, may be proven by circumstantial evidence."), *aff'd*, 655 P.2d 405 (Colo. 1982).  The relevancy of evidence — i.e., "whether it renders the claimed inference more probable than it would be without the evidence" — and not its stand-alone sufficiency determines admissibility.  *Bush v. Jackson*, 191 Colo. 249, 251, 552 P.2d 509, 511 (1976); *see People v. Summitt*, 132 P.3d 320, 324 (Colo. 2006).

¶ 43    One inference that may be drawn from "evidence of flight" is "consciousness of guilt." *Bush,* 191 Colo. at 251, 552 P.2d at 511. This inference usually arises in criminal cases. *See Summitt,* 132 P.3d at 324. Yet, in *Bush,* the supreme court applied a similar inference in a civil case. The court held that evidence of a property transfer — its flight, at the owner's behest — "after an occurrence which may render that person liable in damages" was admissible "to show a consciousness of liability and a purpose to evade satisfaction of it." *Bush,* 191 Colo. at 251, 552 P.2d at 511.

## 2.  Analysis

¶ 44    Initially, Kliem argues that evidence of his post-accident flight should not have been admitted because consciousness of guilt "is not a material consideration in a civil case." True, an actor's mental state when the act occurred — mens rea, in criminal cases — is not relevant to proving negligence because the actor may have intended to act reasonably and still failed to do so. But the difference is timing, not substance. As explained in *Bush,* evidence of concealing assets *after* an event potentially creating liability "is admissible to show a consciousness of liability." *Id.*

22

¶ 45    The modern view among courts that have addressed flight evidence in civil cases supports this analysis. In *Karl v. C. A. Reed Lumber Co.*, 79 Cal. Rptr. 852, 854 (Cal. Ct. App. 1969), for example, the court explained that "flight immediately after an accident is a circumstance that may be considered with other facts in the case as tending to show a consciousness of responsibility for the accident." Similarly, in *Peterson v. Henning*, 452 N.E.2d 135, 138 (Ill. App. Ct. 1983), the court explained that "[a] defendant's flight from the scene of the accident can be interpreted as an admission of his negligence for if he were 'guilt free' it is reasonable to assume he would stop to ascertain the nature of the accident or the extent of the victim's injuries." *See also Birch v. Birch*, 755 N.W.2d 144, at *2 (Iowa Ct. App. 2008) (table) ("[A] driver's failure to stop creates an inference in the minds of reasonable people that the driver does not wish to be identified and that his wish to be unidentified stems from a fear of the consequences of being known.") (citation and alteration omitted); *Rock v. McHenry*, 115 S.W.3d 419, 421 (Mo. Ct. App. 2003) ("[I]n civil cases, other courts have held that flight evidence is admissible upon a showing that a defendant fled for the purpose of escaping liability.").

¶ 46    Even so, Kliem argues that evidence of his flight "is simply not probative of which party caused the accident in the first instance." Of course, a person's "conduct in leaving the scene b[ears] no causal connection to the collision." *Bellamy v. Edwards*, 354 S.E.2d 434, 438 (Ga. Ct. App. 1987); *accord Miller ex rel. Miller v. Lewis*, 963 N.Y.S.2d 533, 535 (N.Y. Sup. Ct. 2013) ("There can be little dispute that conduct following the accident indeed bears little if any 'proximate relation' to the cause of the accident."). Still, such evidence may be admitted "in connection with [the person's] other acts preceding the injury, as tending to establish [their] conduct in causing the injury as being negligence." *Bellamy*, 354 S.E.2d at 438; *see Miller*, 963 N.Y.S.2d at 536 (Evidence the defendant "continued to drive further down the block, failed to call 911 and placed and received numerous phone calls . . . are all admissible as evidence of [the defendant's] consciousness of liability.").

¶ 47    This bridge between pre-accident and post-accident conduct carries particular weight here. Evidence of Kliem's flight was relevant to explain why plaintiff was unable to present any direct proof of Kliem having been impaired by alcohol, such as a breath test or blood draw shortly after the accident had occurred. *See*

*Edwards v. Cross*, 64 S.E.2d 6, 7 (N.C. 1951) ("By rendering the plaintiff unconscious and running away the motorist has forced her to rely on circumstantial evidence.").

¶ 48　　Undaunted, Kliem argues that evidence of his flight should not have been admitted because his "panicked reaction . . . could have been triggered by any number of influences unrelated to intoxication." To be sure, as recognized in *Johnson v. Austin*, 280 N.W.2d 9, 13 (Mich. 1979), "it is possible that for personal reasons, innocent as far as the law is concerned, a driver may wish to avoid identifying himself." *See also Fisher By & Through Fisher v. Trapp*, 748 P.2d 204, 207 (Utah Ct. App. 1988) ("Trapp's flight could have indicated fear or remorse just as easily as consciousness of guilt."). But when testing for relevancy, "it does not matter that other inferences may be equally probable." *Bush*, 191 Colo. at 251, 552 P.2d at 511. And Kliem was free to "present evidence to explain his failure to stop." *Peterson*, 452 N.E.2d at 138. Indeed, Kliem testified that he drove away because he did not know what he had hit and then he fled on foot because he panicked.

¶ 49    For these reasons, we discern no abuse of the trial court's

considerable discretion in allowing evidence of Kliem's post-accident

flight.

### III. Sufficiency of the Evidence to Support the Exemplary Damages Award

¶ 50    Kliem next contends that because "plaintiff's theory that Kliem

had been intoxicated is built upon speculation and conjecture

alone" and "there was nothing improper about Kliem's left turn,"

plaintiff failed to prove, beyond a reasonable doubt, that she was

entitled to exemplary damages. We conclude that the evidence was

sufficient.

### A. Standard of Review and Law

¶ 51    The party requesting exemplary damages must prove the

statutory requirements beyond a reasonable doubt. *See*

§ 13-25-127(2), C.R.S. 2016. The "reasonable doubt burden is by

definition a heavy one," *Tri-Aspen Constr. Co. v. Johnson*, 714 P.2d

484, 486 (Colo. 1986), and "whether the evidence was sufficient to

justify an award of exemplary damages is one of law that we review

de novo," *Qwest Servs. Corp.*, 252 P.3d at 1092. Still, an appellate

court views the evidence in the light most favorable to the party

awarded exemplary damages. *Id.* And exemplary damages may be awarded based on evidence that "the accident occurred while the defendant was driving under the influence of alcohol." *Ortivez v. Davis*, 902 P.2d 905, 911 (Colo. App. 1995).

## B.  Analysis

¶ 52    Plaintiff sought exemplary damages based on circumstantial evidence that Kliem was intoxicated at the time of the accident. As related to the sufficiency of this evidence, Kliem's two arguments are unpersuasive.

¶ 53    Kliem's first argument — that the evidence is insufficient to support an inference that he was intoxicated at the time of the accident — falls short.

¶ 54    True enough, no direct evidence showed that Kliem was intoxicated. Yet, from the following circumstantial evidence, a reasonable jury could have concluded that he was.

- Kliem testified that he learned in his "alcohol classes" that a person's blood alcohol content "reduces by 0.01 in an hour."

- Photographs of Kliem's vehicle after the accident showed seven bottles of beer, some empty, and a single-serving bottle of vodka in the driver's cup holder.

- Kliem testified that he "was in severe pain" from "two broken ribs and . . . one fractured rib," yet he did not seek medical attention until after he turned himself in.

- The investigator testified that had Kliem not fled the scene, part of the investigation would have been "to find out if [Kliem] had anything in his body that may have affected the crash."

- Kliem testified that he "saw . . . on the news" that the police were looking for him and had come "to [his] parents' house the night of the accident," but still did not turn himself in until two days after the accident.

¶ 55 Still persisting, Kliem argues that both passengers testified in their depositions that the open beer bottles belonged to them and Kliem did not consume any alcohol. But the jury could have rejected this testimony entirely. *See Vaccaro v. Am. Family Ins. Grp.*, 2012 COA 9M, ¶ 34 ("The credibility of the witnesses, the sufficiency, probative effect and weight of the evidence, and the inferences and conclusions to be drawn therefrom are all within the province of the fact finder."). For example, the jury could have discounted their testimony because neither passenger appeared at trial, even though one of them had been served with a subpoena.

¶ 56    Kliem's suggestion that exemplary damages can be awarded only based on direct evidence of intoxication finds no support in Colorado law. Imposing such a requirement would be especially improper where the driver — like Kliem — fled the scene. As the court in *Owens v. Anderson*, 631 So. 2d 1313, 1317-18 (La. Ct. App. 1994), explained:

> [I]n cases such as the instant one where the driver fled the scene and was not apprehended or otherwise timely tested, blood alcohol evidence is not available. Does this mean that all an intoxicated driver need do to avoid [exemplary damages] liability is to successfully flee the accident scene? We think not. . . . Blood alcohol level is not the only way in which intoxication can be established in a civil case. The triers of fact can look to the totality of the circumstances.

*See also Matalon v. Lee*, 847 So. 2d 1077, 1080 (Fla. Dist. Ct. App. 2003) ("Although there was no direct proof of intoxication on [defendant's] behalf (in no small part due to the fact that [defendant] fled the scene of the accident), there was a wealth of circumstantial evidence of intoxication.").[5]

---

[5] Nor does Kliem cite any authority that exemplary damages generally must be based on direct evidence. To the contrary, courts have held that "the plaintiff need not present direct evidence; punitive damages may be awarded based on circumstantial

¶ 57    Kliem's second argument — that exemplary damages were improper because his left-hand turn was legal — also misses the mark.

¶ 58    True enough, the investigating officer and experts for both Kliem and plaintiff all testified favorably about his initial decision to turn left across the southbound lanes. The investigator said Kliem could not have "anticipated the motorcycle as a hazard" in making his decision. Kliem's expert opined that no traffic law violations had occurred in making the left-hand turn. And even plaintiff's expert did not "express[] any criticism" with regard to Kliem's "decision to make the left turn in the first instance."

¶ 59    Yet, other evidence weighed against Kliem:

- Plaintiff's expert testified that Kliem "could have and should have seen the oncoming motorcycle from a significant distance away." And he should have "observed the fact [the motorcycle] was approaching faster than normal traffic."

evidence and the reasonable inferences drawn therefrom." *Newman v. Select Specialty Hosp.-Ariz., Inc.*, 374 P.3d 433, 437 (Ariz. Ct. App. 2016). Indeed, by comparison, proof beyond a reasonable doubt in criminal cases can be solely circumstantial. *See People v. Florez*, 179 Colo. 176, 178, 498 P.2d 1162, 1163 (1972) ("Although guilt of the crime of burglary may be established beyond a reasonable doubt solely by circumstantial evidence.").

- This expert also testified that even after Kliem had initiated the left turn, "[t]here was time for response." Namely, "had the brakes been applied when [Kliem] got halfway across lane two, the vehicle could [have] stopped prior to entering lane number one," where the collision occurred.

- The investigator testified that alcohol can "have a dramatic impact on perception"; "influence personality changes"; "increase[] risk judgment"; "affect muscular coordination"; "affect a person's peripheral vision"; and "affect critical judgment."

¶ 60 Kliem cites no authority, nor have we found any in Colorado, requiring that a traffic law violation be shown before exemplary damages can be awarded. Thus, viewing this testimony in a light most favorable to the judgment, a reasonable juror could have concluded that — even if the left-hand turn did not violate any traffic laws — Kliem ultimately failed to avoid the motorcycle because he was intoxicated.

¶ 61 Accordingly, we conclude that sufficient evidence supports the exemplary damages award.

## IV. Reducing Noneconomic Damages for Comparative Fault Before Applying the Cap

¶ 62    Finally, Kliem contends the noneconomic damages cap in section 13-21-203 must be applied to an award of noneconomic damages before comparative negligence is apportioned. Under this scenario, plaintiff's noneconomic damages would be reduced to $436,070 — the current noneconomic damages cap — and then fifty-five percent of that amount would be apportioned to Kliem, resulting in a net judgment of $239,838.50.

¶ 63    The trial court disagreed. It first apportioned fifty-five percent of the total noneconomic damages to Kliem — $412,500.00 — and then, because that amount was less than the damages cap, it did not make a further reduction. We agree with the trial court.

### A. Standard of Review and Law

¶ 64    This issue raises a question of statutory interpretation, which is reviewed de novo. *Granite State Ins. Co.*, 183 P.3d at 567.

¶ 65    The Colorado Wrongful Death Act (WDA), sections 13-21-201 to -204, C.R.S. 2016, allows a "decedent's surviving spouse and heirs to seek damages if death was caused by negligence." *Lanahan v. Chi Psi Fraternity*, 175 P.3d 97, 99 (Colo. 2008). Historically,

these damages "were limited to the net pecuniary loss suffered by the survivors." *Id.* But in 1989, the General Assembly amended the WDA "to allow survivors to recover noneconomic damages as well." *Id.*

¶ 66    The WDA caps recovery of noneconomic damages at a maximum of $250,000, adjusted for inflation. *See id.* at 100 (explaining that unlike section 13-21-102.5, "section 13-21-203 caps noneconomic damages at $250,000 even when there is clear and convincing evidence to support a higher award"). Specifically, section 13-21-203(1)(a) provides:

> There shall be *only one civil action* under this part 2 for *recovery of damages* for the wrongful death of any one decedent. *Notwithstanding anything in this section or in section 13-21-102.5 to the contrary*, there shall be no recovery under this part 2 for noneconomic loss or injury in excess of two hundred fifty thousand dollars, unless the wrongful act, neglect, or default causing death constitutes a felonious killing . . . .

(Emphasis added.)

¶ 67    In *Lanahan,* 175 P.3d at 100, the supreme court rejected the assertion that this section applies on a per defendant basis. It held that section 13-21-203 "permits one action per decedent to recover

33

a maximum of $250,000 in noneconomic damages . . . regardless of the number of Respondents from whom she may be entitled to recover such damages." *Id.* at 100-01. The court explained that "the term 'recovery,' as used in section 13-21-203, is unambiguous and refers to plaintiff's recovery, which is expressly limited to $250,000." *Id.* at 101.

## B. Analysis

¶ 68 Kliem argues that because in *Lanahan* the court applied the noneconomic damages cap "before pro rata allocation among defendants," here plaintiff's "comparative fault should be applied using the same measure." *Lanahan* does not support this result.[6]

¶ 69 "The purpose of comparative negligence is to apportion negligence among those who caused the harm." *Nat'l Farmers Union Prop. & Cas. Co. v. Frackelton*, 662 P.2d 1056, 1059 (Colo. 1983). Under the comparative negligence statute, section

---

[6] We agree with Kliem that *General Electric Co. v. Niemet*, 866 P.2d 1361, 1362 (Colo. 1994), which addressed section 13-21-102.5, C.R.S. 2016, is not instructive. As explained in *Lanahan v. Chi Psi Fraternity*, 175 P.3d 97, 102-03 (Colo. 2008), because "the language of section 13-21-203 expressly recognizes that the cap on noneconomic damages in wrongful death actions is to be given its own meaning, regardless of anything stated to the contrary in section 13-21-102.5 . . . *Niemet's* rationale is inapposite.").

13-21-111, C.R.S. 2016, "the relative degrees of the plaintiff's and defendant's fault must be ascertained to determine whether and what amount of *recovery* is proper." *Gordon v. Benson*, 925 P.2d 775, 777 (Colo. 1996) (emphasis added) (citation omitted).

¶ 70 To determine that recovery, section 13-21-111(1) requires that "any *damages* allowed shall be diminished in proportion to the amount of negligence attributable to the person for whose injury, damage, or death recovery is made." (Emphasis added.) Thus, comparative negligence reduces the amount of damages found by the trier of fact, to determine the amount recoverable by a plaintiff.

¶ 71 Once the amount of a plaintiff's recovery is determined, then the noneconomic damages cap in section 13-21-203 comes into play. *Lanahan*, 175 P.3d at 101 (Section 13-21-203 limits "the monetary amount to which the *plaintiff* is entitled.") (emphasis added). The cap does not cause a plaintiff's noneconomic damages to disappear — it merely limits a plaintiff's recovery to a specified maximum amount. *See McAdory v. Rogers*, 264 Cal. Rptr. 71, 74 (Cal. Ct. App. 1989) (The statutory cap "does not cause those noneconomic damages . . . suffered in excess of $250,000 to vanish.

Instead, that section merely reflects a legislative policy decision to bar the recovery of more than $250,000 of those damages.").

¶ 72    Applying the noneconomic damages cap in section 13-21-203 after damages have been reduced based on a plaintiff's comparative negligence makes sense for two reasons.

¶ 73    First, if a plaintiff's percentage of negligence is applied after damages have been reduced to the amount of the cap, "the jury's damages finding in most instances would be meaningless." *Atkins v. Strayhorn*, 273 Cal. Rptr. 231, 238 n.8 (Cal. Ct. App. 1990). This is so because the cap would affect the amount of damages more than the jury's verdict. After all, the jury determines both the total amount of damages and the comparative fault. But by applying comparative negligence first, the amount of damages attributable to a defendant is determined consistent with the verdict, although the plaintiff is only entitled to recover up to the statutory cap. *Cf. People v. Fuentes*, 258 P.3d 320, 326 (Colo. App. 2011) ("[W]e must maximize the effect of the jury's verdict.").

¶ 74    Second, as recognized in *McAdory*, 264 Cal. Rptr. at 74, because of the cap, a plaintiff "is already receiving an amount less than the jury determined he was damaged by [the] tortious

conduct." *Atkins*, 273 Cal. Rptr. at 238 (declining to apply comparative fault after damages cap). Further reducing the capped noneconomic damages based on the negligence of a plaintiff would create an even greater disparity between the actual loss and the recovery.

¶ 75    This reasoning was illustrated in *McAdory*, 264 Cal. Rptr. at 74, where, like here, the court addressed the interplay between comparative fault and a damages cap that limited a plaintiff's recovery of noneconomic damages. The court rejected the argument that comparative negligence should be applied after reducing the verdict based on the cap:

> [P]laintiff . . . is determined to be 10 percent comparatively at fault and is awarded $1 million in noneconomic damages. [If comparative fault was applied after the damages cap], this plaintiff's noneconomic damage award, already reduced to $250,000, will be further reduced by another $25,000 even though the jury found that the fault of others proximately caused him $900,000 in noneconomic damages.

*Id.* at 75.[7]  We consider *McAdory* well-reasoned and apply it here.

---

[7] Other courts are in accord. *See McCart v. Muir*, 641 P.2d 384, 394 (Kan. 1982) ("In applying the comparative negligence statute . . . in an action for death by wrongful act . . . the percentage of causal

¶ 76     Given all of this, we conclude the trial court properly determined the amount of plaintiff's recovery by first apportioning the percentage of comparative negligence attributable to Kliem and then applying the noneconomic damages cap in section 13-21-203 to that amount.

## V. Conclusion

¶ 77     The judgment is affirmed.

JUDGE ASHBY and JUDGE NIETO concur.

---

fault attributable to decedent's negligence plus the percentage of additional causal fault attributable to any direct negligence of the plaintiff are to be deducted from the amount of damages awarded by the court or jury for nonpecuniary damages, rather than from the maximum permissible recovery for nonpecuniary damages allowable . . . ."); *Collins v. Commonwealth of Ky. Nat. Res. & Envtl. Prot. Cabinet*, 10 S.W.3d 122, 127 (Ky. 1999) (Board "erroneously reduced for comparative negligence from the statutory maximum rather than from the total damages."); *see generally* 4 John W. Chandler, Handling Motor Vehicle Accident Cases § 15:4, Westlaw (2d ed., database updated September 2016) ("One issue of some importance that has been litigated in a few cases and is not generally addressed explicitly by damages limitation statutes is the interaction between a damages cap and principles of comparative fault and allocation of liability.  There have not been a large number of reported cases on this issue, but most cases have held that any reduction or allocation based on comparative fault must be done before applying the statutory cap.").